IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| RAYMOND L. ZISUMBO,<br><br>        Plaintiff,<br><br><br><br><br><br>        vs.<br><br><br>OGDEN REGIONAL MEDICAL CENTER,<br><br>        Defendant. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br><br><br><br><br><br>Case No. 1:10-CV-73 TS EJF |

This matter is before the Court on Defendant Ogden Regional Medical Center's ("ORMC") Motion for Summary Judgment.[1]  For the reasons set forth below, the Court will grant the Motion in part and deny it in part.

## I.  FACTUAL BACKGROUND

The following facts are either uncontroverted or, where controverted, are construed in the light most favorable to the nonmovant, Plaintiff.  Immaterial facts and factual averments not properly supported by the record are omitted.

---

[1]Docket No. 42.

A. EMPLOYMENT

On April 11, 2005, Plaintiff Raymond Zisumbo self-identified as "Spanish" on an ORMC form titled New Hire Information Sheet. On April 18, 2005, ORMC hired Zisumbo as a CT (computer tomography or "CAT" scan) Tech in its Imaging Department. ORMC Human Resources ("HR") Director Chris Bissenden signed and sent Zisumbo a letter offering to employ him at ORMC.

ORMC provides its employees with a Code of Conduct (the "Code") produced by ORMC's parent company, HCA, which provides the policies that employees of ORMC must follow. The Code is signed by the CEO and COO of HCA, and states:

> If you have questions regarding this Code or encounter any situation which you believe violates provisions of this Code, you should immediately consult your supervisor, another member of management at your facility, your Facility Human Resources Manager, your Facility Ethics and Compliance Office, the HCA Ethics Line (1-800-455-1996) or the Corporate Ethics and Compliance Office. You have our personal assurance there will be no retribution for asking questions or raising concerns about the Code or for reporting possible improper conduct.[2]

The Code further informs employees, "Your adherence to [the Code's] spirit, as well as its specific provisions, is absolutely critical to our future."[3] The Code states that HCA

> actively promotes diversity in its workforce at all levels of the organization. We are committed to providing an inclusive work environment where everyone is treated with fairness, dignity, and respect. We will make ourselves accountable to one another for the manner in which we treat one another and for the manner in which people around us are treated. We are committed to recruit and retain a diverse staff reflective of the patients and communities we serve.[4]

---

[2]Docket No. 66-2, at 21.

[3]*Id.* at 22.

[4]*Id.*

The Code further provides that "HCA makes every effort to maintain, within the limits of the law, the confidentiality of the identity of any individual who reports concerns or possible misconduct.  There is no retribution or discipline for anyone who reports a concern in good faith."[5]  The Code also contains an acknowledgment card for employees to sign, certifying, "I have received the HCA Code of Conduct, understand it represents mandatory policies of the organization and agree to abide by it."[6]  Zisumbo signed this acknowledgment in 2006.

B.      SUPERVISORS AND PERFORMANCE REVIEWS

Zisumbo's first ORMC supervisors was John Diemel (Director of Imaging), then Joyce Park (CT Coordinator) and Mike Skorheim (CT Coordinator).  Zisumbo's supervisors generally gave him good performance reviews.  His performance review signed May of 2006 states, "Ray is very good at the technical part of exams.  He has an excellent memory for details and he can work very hard.  Ray needs to work at being a team player."[7]  During his 2006 evaluation, Zisumbo was also told that he "becomes defensive if he's asked about a problem or error that occurred."[8]  In this same evaluation, Zisumbo was granted a two percent merit raise.  Zisumbo's performance review dated August 23, 2007, gives him a good review but also states the following: "need work on being a team player at times."[9]  An evaluation signed by both John

---

[5]*Id.*

[6]*Id.*

[7]Docket No. 66-1, at 17.

[8]*Id.*

[9]Docket No. 42, at 9; Docket No. 56, at xxiii.

Diemel and Michael Skorheim on July 9, 2008, makes no negative comments, and states that

"Ray works at a high level without need for constant supervision," and that "Ray has agreed to

act as Lead Tech in regard to our upcoming cardiac program."[10]  On July 21, 2009, another

supervisor, Anthony Rodebush, gave Zisumbo a high performance evaluation, but also stated that

Zisumbo needed to listen more to co-workers.

C.      COORDINATOR POSITION

        During Zisumbo's tenure at ORMC, up until January 2009, there was always a person in

a position with the title of CT Coordinator.  In 2007, that position became available.  Zisumbo

applied for it, but another employee, Mike Skorheim, was hired instead.  When Skorheim left the

position in January 2009, Zisumbo assumed many of the responsibilities of CT Coordinator but

was not officially promoted to that position.  These responsibilities included making work

schedules, ordering supplies, training all of the technicians Zisumbo worked with, making

protocols for the CT scanners, relating the protocols to radiologists, setting up procedures, and

overseeing the entire department.  At Zisumbo's invitation, some of the other techs participated

in scheduling, but Zisumbo was the only tech to assume the other CT Coordinator

responsibilities.

        In June 2009, Anthony Rodebush was hired as the Imaging Director.  One of Rodebush's

responsibilities was to supervise the CT techs, including Zisumbo.  Starting with Rodebush's

first week as the Imaging Director and continuing until the time Zisumbo was fired, Zisumbo

approached Rodebush nearly every week, asking to be hired as the CT Coordinator.  Rodebush

--------

[10]Docket No. 60-6, at 1.

had not yet requested the authority to fill the position and responded to Zisumbo's requests by stating that he wanted to take his time before making a decision so that he could get to know the department.  In the meantime, Zisumbo continued to fulfill many of the responsibilities of a CT Coordinator.  Rodebush's notes during this time state that Zisumbo "has functioned in a pseudo-coordinator-like role for some time."[11]

D.    ST. MARK'S LETTER

On August 3, 2009, Zisumbo gave Rodebush a letter purporting to be from St. Mark's Hospital and another letter giving his work history at the University of Utah.  Zisumbo testified that he asked his wife, Melany Zisumbo, to get the letters for him because he had heard there was a rumor going around that he had been fired from every job he ever had and he wanted to put an end to them.  During his deposition, however, Rodebush stated that he understood that Zisumbo had obtained the letters from his attorney.  After receiving the letters, Rodebush put them in his files without looking at them.

The St. Mark's letter states:

> To whom it may concern:
> Raymond L Zisumbo was hired on with HCA on 3/22/04, he started at Lakeview Hospital and then transferred to St. Mark's in December.  He is currently still employed at Ogden Regional Medical Center.  He has not been terminated and his employment standing is good.  Should you have any further questions regarding this feel free to call our HR department . . . .[12]

---

[11]Docket No. 59-6, at 1.

[12]Docket No. 42-1, at 54.

E.      PIZZA PARTY

On September 15, 2009, Rodebush hosted a pizza party in his office to celebrate the CT

Department's success in completing an employee engagement survey.  Rodebush allegedly began

the party by telling Zisumbo that "everybody here in this room believes that you're untrustworthy

and that's why you're not going to be CT Coordinator."[13]  Rodebush then said, "let's put it to a

vote."[14]  Rodebush also told Zisumbo that some employees had complained about him.  After

some discussion among the employees about who had or had not complained about Zisumbo, the

party quickly ended.  In his deposition, Rodebush testified that because the party did not go well,

this was the only time that he had talked about the pros and cons of an employee in a meeting

like that.

F.      ETHICS COMPLAINT & WRITTEN WARNING

On September 18, 2009, Zisumbo filled out an initial complaint form with the Utah Labor

Commission alleging ORMC had discriminated against him based on his race.   ORMC did not

become aware of this until after Zisumbo filed a charge of discrimination on October 30, 2009.

On September 21, 2009, Zisumbo contacted the ORMC ethics hotline and complained

that he had been treated unfairly by Rodebush during the pizza party, that he was performing the

responsibilities of CT Coordinator without pay, that he was being unfairly kept from a promotion

to CT Coordinator, and that other techs were making false reports about him to Rodebush.  Later

---

[13]*Id.*, at 35.  Although Rodebush's recollection of what was said at the pizza party differs
somewhat from what is stated here, these statements are construed in the light most favorable to
Zisumbo.

[14]*Id.*

6

that same day, ORMC Ethics Officer Judd Taylor informed Rodebush that Zisumbo had filed a complaint with the ethics line, and Taylor provided Rodebush with a copy of Zisumbo's complaint.

On October 1, 2009, Taylor met with Rodebush and went over Zisumbo's allegations with him.  In this private meeting, Taylor asked Rodebush his version of the events about which Zisumbo had complained.  Taylor did not attempt to interview Zisumbo about his complaints separately.  Instead, after he finished interviewing Rodebush, Taylor interviewed Zisumbo together with Rodebush, even though many of Zisumbo's complaints were about Rodebush.  When asked if Taylor's method of interviewing Zisumbo with Rodebush present would be intimidating, ORMC's HR Director, Chris Bissenden, testified that she "would never do it with the person sitting there."[15]  During the meeting, Zisumbo informed Taylor and Rodebush that he had called the ORMC ethics line because the Utah Labor Commission had advised him to try to first resolve his concerns with his employer.  Zisumbo later walked out of the meeting because he felt like nobody was listening to him.  Rodebush later testified that based upon the October 1 meeting, "it was clear that [Zisumbo] needed to have a written warning."[16]

The next day, on October 2, 2009, Rodebush gave Zisumbo the first written warning he had received since he began working at ORMC.  In his deposition, Rodebush claimed that the process of preparing this warning started before Zisumbo filed an ethics complaint on the ORMC hotline.  Specifically, he stated that in early September, Bissenden had advised him to describe,

---

[15]Docket No. 66-2, at 27.

[16]*Id.*

7

in writing, how Zisumbo's behavior was negatively impacting his coworkers by selecting a number of incidents that had occurred over a long period of time. Bissenden confirmed this in her testimony. Aside from the testimony of Rodebush and Bissenden, there is no evidence to substantiate Rodebush's assertion that he began preparing the warning prior to the time Zisumbo called the ORMC ethics line. In the warning, Rodebush described four incidents that had occurred prior to Rodebush becoming Zisumbo's supervisor. Rodebush did not discuss the incidents with Zisumbo prior to writing him up for them.

G.     TERMINATION

ORMC had done a background check on Zisumbo prior to hiring him, and obtained the following information from St. Mark's Hospital, which was kept in Zisumbo's file:

> The subject is productive, a fast learner, and gets along well with others. He has also maintained an excellent attendance and punctuality record. It is felt the subject needs minimal improvement in his patient communication skills when explaining to patients the procedures they are undergoing. However, this has not interfered in his overall satisfactory job performance.[17]

On October 8, 2012, Taylor came to Rodebush and indicated that he was looking into Zisumbo's allegations that there were rumors being spread at ORMC that Zisumbo had been fired from other jobs. Taylor inquired what Rodebush knew about the situation. Rodebush retrieved the letters Zisumbo had given him, including the letter from St. Mark's. Taylor looked at them and said he did not believe they looked authentic. Rodebush agreed with Taylor that the letters looked fraudulent. Rodebush testified, however, that he had no reason to think Zisumbo had any knowledge regarding the authenticity of the letters. Rodebush and Taylor then took the

_____

[17]Docket No. 56, at 18; Docket No. 66-2, at 30.

letters to Bissenden to see if she could confirm their authenticity.  Bissenden also thought the letters looked odd.

Bissenden prepared a memo in which she described her attempt to authenticate Zisumbo's letter from St. Mark's Hospital.  In the memo, she states that she spoke with Linda Bingham in the HR Department at St. Mark's Hospital, who verified that the letter had not been issued by their department.  Based on this conversation, Bissenden determined that the St. Mark's letter was fake and decided that Zisumbo should be fired unless he could adequately explain his conduct.  In her deposition, Bissenden acknowledged having no reason to believe that the information in the St. Mark's letter regarding Zisumbo's employment was incorrect.  She also acknowledged that ORMC did not rely on any information in the documents, calling them, "fraudulent documents that were unnecessary."[18]  She also acknowledged that she did not want to know Zisumbo's intent in providing the letters.  Nevertheless, she testified that Zisumbo violated a basic tenet of honesty by providing ORMC with a fraudulent letter.

Rodebush also believed that Zisumbo was dishonest in providing a letter that: (1) contained no false information, and (2) Rodebush understood Zisumbo had obtained from his attorney.  Before discussing the letters with Zisumbo, Rodebush called a security guard to be present because that is "something that is done when we're not sure . . . how [an] employee's going to react to the termination."[19]

---

[18]Docket No. 42-2, at 13.

[19]Docket No. 42-3, at 22.

In a short meeting with Zisumbo on October 8, 2009, Bissenden and Rodebush showed Zisumbo both the St. Mark's letter as well as another letter that they believed was fraudulent. They told Zisumbo that because the letters were fraudulent, they had lost their trust in him.  They informed him that if he had "nothing to say then, you know, effective immediately, your employment at Ogden Regional will be terminated."[20]  Zisumbo did not look at the letters but he assumed one of them was the St. Mark's letter.  Zisumbo did not tell Bissenden that his wife was the one who had obtained the St. Mark's letter or otherwise attempt to explain the letters.  In fact, Zisumbo said nothing at all in the meeting.  At Bissenden's direction, Zisumbo's employment was terminated.  Bissenden made clear to Zisumbo that he could not be rehired at any of the 163 HCA entities anywhere in the country, and Rodebush explained to Zisumbo that he could not come to the hospital in the future unless he was there for an emergency medical reason.

H.      NEW COORDINATOR

By October 14, 2009, six days after Plaintiff was terminated, Rodebush put in a request that the CT Coordinator position be filled.  Rodebush characterized the position as "much needed."[21]  The request stated that the position was being filled to replace Zisumbo, but Bissenden testified that "this does not in any way indicate that Ray held that position."[22]  Shane Reed, who is not a member of a minority, applied for the position.  According to his resume, he

---

[20]*Id.*

[21]Docket No. 59-2, at 44.

[22]Docket No. 66-2, at 32.

had only two years of CT experience, and had obtained an Associate's degree in 2008.  Reed was

hired as the CT Coordinator in November 2009.

I.      OTHER TERMINATIONS

ORMC has fired nine employees for falsifying documents, at least some of whom were

not Hispanic or any other minority.  Five of these employees were fired for time card fraud, one

for submitting a falsification of a Basic Life Support Certification card, one for falsifying records

relating to a patient's blood donation, one for fraud on a form for medical/dental insurance

benefits, and one for submitting a fraudulent social security card.  In each case, ORMC

investigated and concluded that the employee was responsible for the falsification.

ORMC also disciplined one employee who was suspected, but not confirmed, to have

falsified her Basic Life Support Certification card.  In that case, because the card had been

slipped under the door of an office, it was not known who had provided the card.  Once ORMC

determined the card was in fact fraudulent, the suspected employee's director spoke with the

employee who alleged that her supervisor had submitted the card on her behalf.  Because it could

not be determined who submitted the card, the employee was only suspended for one day without

pay.

II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."[23]  In

considering whether genuine issues of material fact exist, the Court determines whether a

---

[23]Fed. R. Civ. P. 56(a).

reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[24]   The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[25]

## III.  DISCUSSION

Plaintiff's Amended Complaint states three claims against Defendant: (1) discrimination in violation of Title VII; (2) retaliation in violation of Title VII; and (3) breach of the duty of good faith and fair dealing.  These claims will be considered in turn below.

A.     TITLE VII DISCRIMINATION

Plaintiff first alleges discrimination based on race and national origin in violation of Title VII.  Plaintiff's Amended Complaint states claims for a hostile work environment and individual incidents of discrimination.  As there is a different analysis for a hostile work environment claim than for a claim based on individual discriminatory actions, these claims will be evaluated separately.

*1.     Individual Incidents*

Plaintiff claims he was discriminated against in violation of Title VII based on three separate events: (1) he was not given the job as a CT Coordinator in 2007; (2) he was again not given the CT Coordinator job in 2009; and (3) his employment was terminated in October of 2009.

---

[24]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[25]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.,* 925 F.2d 1288, 1292 (10th Cir. 1991).

A.     *2007 CT Coordinator*

Plaintiff first argues that he was discriminated against when he did not receive the CT coordinator job in 2007.

"In states in which a state agency has authority to investigate employment discrimination ('deferral states'), Title VII requires claimants to file a charge of discrimination within 300 days of the alleged unlawful employment practice.  Utah is a deferral state."[26]

 "Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"[27]  "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act."[28] Therefore, in order for the claim to be actionable, it "must be filed within the . . . 300-day time period after the discrete discriminatory act occurred."[29]

As Plaintiff first filed a charge with the EEOC on September 18, 2009, any incident on which a claim could be predicated must have occurred on or after November 22, 2008.  As a result, Plaintiff's claim regarding his failure to receive the CT Coordinator job in 2007 was not timely filed and must be dismissed.

---

[26]*Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 n.1 (10th Cir. 2003).

[27]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

[28]*Id.* at 113.

[29]*Id.*

>    B.    2009 CT Coordinator

Plaintiff next argues that he was discriminated against in 2009 when he was again not given the job of CT Coordinator.

Where, as here, a plaintiff does not present direct evidence of intentional discrimination but instead relies on circumstantial evidence, courts apply the "*McDonnel Douglas* burden shifting framework originally devised in the Title VII context to evaluate whether [Plaintiff] has demonstrated Defendant['s] discriminatory intent circumstantially."[30]  Under the *McDonnell Douglas* scheme, in order to survive summary judgment on a circumstantial case, the plaintiff must first establish a prima facie case of discrimination."[31]

> If the plaintiff carries that burden, the burden shifts to the defendant to articulate a facially nondiscriminatory reason for the challenged employment action.  If the defendant makes such a showing, the burden reverts to the plaintiff to prove that the proffered nondiscriminatory reason is pretextual, from which a jury may infer discriminatory intent.[32]

To make out a prima facie case of discrimination, Plaintiff must demonstrate "(1) membership in a protected class, (2) adverse employment action, and (3) disparate treatment among similarly situated employees."[33]  "[A]dverse employment actions 'constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in

---

[30]*Reynolds v. Sch. Dist. No. 1, Denver Colo.*, 69 F.3d 1523, 1533 (10th Cir. 1995) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–05 (1973)).

[31]*Id.* (citing *McDonnell Douglas Corp.*, 411 U.S. at 802).

[32]*Id.* (internal citation omitted).

[33]*Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005).

14

benefits."[34]  "[A]ctions which deprive[ ] [a plaintiff] of compensation which he otherwise would have earned clearly constitute adverse actions for purpose of Title VII."[35]

Zisumbo has made a prima facie case of discrimination.  First, there is no dispute that Plaintiff is a member of a protected class.  The second factor is also met because Zisumbo assumed many of the responsibilities of a CT Coordinator, but did not receive the additional pay or title that would come with an official promotion to that position.  Finally, Zisumbo was treated differently from other similarly situated employees because, unlike Mike Skorheim and Shane Reed, the employees who performed the responsibilities of CT Coordinator before and after him, respectively, Zisumbo never received the title or compensation of CT Coordinator.[36]

As Plaintiff has made a prima facie case of discrimination, the burden shifts to Defendant to state a facially nondiscriminatory reason for not officially promoting Zisumbo to the position of CT Coordinator.  Defendant has satisfied this "exceedingly light" burden.[37]  Defendant need "only produce evidence that would dispel the inference of retaliation by establishing the existence of a legitimate reason."[38]

---

[34]*Id.* at 1150 (alterations in original).

[35]*Id.* (quoting *Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1118 (11th Cir. 2001)).

[36]It can also be said that Zisumbo was treated differently than the other CT Techs who received the same pay but did not have to perform the additional responsibilities of CT Coordinator.

[37]*Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002).

[38]*Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 n.4 (10th Cir. 2007).

ORMC has introduced deposition testimony supporting its claim that it never promoted Zisumbo to CT Coordinator because the position was not available while Zisumbo was employed with ORMC.  Furthermore, ORMC claims it did not make the position available because Rodebush, the new director, "had decided to wait to get to know the department before he made any decisions on requesting permission to hire a CT Coordinator . . . ."[39]

As Defendant has articulated a facially nondiscriminatory reason for not promoting Zisumbo, the burden reverts to Plaintiff to "prove that the proffered nondiscriminatory reason is pretextual."[40]   In order to establish a genuine issue as to pretext, Plaintiff must show that Defendant's "proffered non-discriminatory reason is unworthy of belief."[41]  Plaintiff may accomplish this "by  producing evidence of 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"[42]  "Summary judgment is not ordinarily appropriate for settling issues of intent or motivation."[43]

---

[39]Docket No. 42, at 34.

[40]*Reynolds*, 69 F.3d at 1523.

[41]*Pinkerton v. Colo. Dep't of Transp.*, 563 F.3d 1052, 1065 (10th Cir. 2009) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

[42]*Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006)).

[43]*McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (citing *Setliff v. Mem'l Hosp. of Sheridan Cnty.*, 850 F.2d 1384, 1394 n.12 (10th Cir. 1988)).

Here, Defendant has introduced evidence that Rodebush put off Zisumbo's request that he be considered for the position of CT Coordinator for several months, stating that he wanted to get to know the department before requesting permission to fill the position.  Then, on October 14, 2009, just six days after Zisumbo was fired, Rodebush put in a request to fill the CT Coordinator position, characterizing the position as "much needed."[44]  The request also stated that the position was being filled to replace Zisumbo,[45] although Defendant points out that Bissenden, ORMC's HR Director, stated that "this does not in any way indicate that Ray held that position."[46]

The Court finds that Plaintiff has introduced sufficient facts to raise a genuine issue as to Defendant's motivation for not making the CT Coordinator position available until after Zisumbo was fired.  The facts recited above could lead a reasonable factfinder to conclude either that Defendant decided to fill the CT Position soon after it fired Zisumbo because that was the amount of time Rodebush needed to get to know the department, or a jury could find that the timing was sufficiently suspicious as to show that ORMC's actual desire was to avoid promoting Zisumbo.  Because summary judgment is not the appropriate vehicle for deciding Defendant's motivation, the Court will deny the Motion as it relates to Plaintiff's 2009 CT Coordinator claim.

### C.    Termination

Next, Plaintiff argues that he was discriminated against when he was fired from ORMC. The *McDonnell Douglas* burden shifting analysis described above also applies to this claim.

---

[44]Docket No. 59-2, at 44.

[45]*Id.*

[46]Docket No. 66-2, at 32.

Defendant does not dispute that Plaintiff has made a prima facie claim that his termination was discriminatory.  The burden therefore shifts to ORMC to articulate a nondiscriminatory reason for firing Zisumbo.  Defendant has satisfied this burden by presenting evidence that it fired Zisumbo because he submitted to ORMC the St. Mark's letter, which ORMC believed to be fraudulent.

The burden therefore reverts to Plaintiff to show that Defendant's purported reason for firing Zisumbo is pretextual.  The Court finds that Zisumbo has met this burden.  First, ORMC had no interest in the authenticity of the St. Mark's letter until after Zisumbo made his complaint through the ORMC ethics hotline.  Second, even though Rodebush believed that the letter had come from Zisumbo's attorney, not Zisumbo, Rodebush still believed that the letter provided a basis for termination.  Third, unlike the other incidents in which ORMC has disciplined its employees for submitting false documents, the St. Mark's letter was not requested by ORMC, did not affect Zisumbo's benefits, and contained true information.

Finally, after having worked for more than four years at ORMC without any written warnings, Rodebush gave Zisumbo such a warning within two weeks of Zisumbo's ethics line complaint and the day after Rodebush and Taylor met with Zisumbo regarding his complaint. Further, although Rodebush stated that, after that meeting, it was clear that Zisumbo needed to have a written warning, the warning he was given made no mention of that meeting, but instead referenced incidents that had all happened prior to Rodebush's tenure as Zisumbo's supervisor.

This evidence is sufficient to establish a disputed material fact as to whether Defendant fired Zisumbo because he submitted the St. Mark's letter or for some other reason.  The Court will therefore deny the Motion as it relates to this claim.

2.      *Hostile work environment*

Unlike claims based on individual incidents of discrimination, a discrimination claim based on a hostile work environment "is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'"[47]  "It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Such claims are based on the cumulative effect of individual acts."[48]

> It does not matter . . . that some of the component acts of the hostile work environment fall outside the statutory time period.  Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[49]

Although only one act contributing to the claim need occur within the filing period, "that act alone need not rise to the level of actionable harassment as long as it is a part of the ongoing violation."[50]  However,

> if an act on day 401 had no relation to the acts between days 1-100, or for some other reason, *such as certain intervening action by the employer*, was no longer

---

[47]*Morgan*, 536 U.S. at 117.

[48]*Id.* at 115 (internal citations omitted).

[49]*Id.*

[50]*Derijk v. Southland Corp.*, 313 F. Supp. 2d 1168, 1173 (D. Utah 2003).

part of the same hostile environment claim, then the employee cannot recover for the previous acts, at least not by reference to the day 401 act.[51]

"To determine whether separate acts are part of the same practice, we look to the type, frequency, and timing of the acts, as well as to the perpetrator of the acts."[52]  "[A] series of alleged events comprises the same hostile environment where 'the pre- and post-limitations period incidents involve[d] the same type of employment actions, occurred relatively frequently, and were perpetrated by the same managers.'"[53]

For Zisumbo's "harassment claim to survive summary judgment, his facts must support the inference of a racially hostile environment, and support a basis for liability."[54]  "Specifically, it must be shown that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus."[55]  "The plaintiff must show 'more than a few isolated incidents of racial enmity.'"[56]  "Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."[57]

---

[51]*Id.* (quoting *Morgan*, 536 U.S. at 118) (internal quotation marks omitted).

[52]*Duncan v. Manager, Dep't of Safety, City & Cnty. of Denver*, 397 F.3d 1300, 1309 (10th Cir. 2005).

[53]*Id.* (quoting *Morgan*, 536 U.S. at 120).

[54]*Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (internal quotation marks and citations omitted).

[55]*Id.* (internal quotation marks and citations omitted).

[56]*Id.* (quoting *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1412 (10th Cir. 1987)).

[57]*Id.*

Defendant argues that Zisumbo's hostile work environment claim should be dismissed because the claim comprises many alleged comments that are time-barred and those that are not are either not racial or are not severe or pervasive enough to be actionable.  Plaintiff has not responded to this argument and has cited no evidence in support of his hostile work environment claim.

"Summary judgment is the 'put up or shut up' moment in a lawsuit."[58]  Plaintiff "may not rest upon the mere allegations or denials of his pleadings" to avoid summary judgment.[59]  Although Plaintiff has attached numerous exhibits to his opposition papers, "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment . . . ."[60]  Because Zisumbo has failed to "make a showing sufficient to establish the existence of an element essential to [his] case, and on which [Zisumbo] will bear the burden of proof at trial,"[61] the Court will enter summary judgment against him on this claim.

B.     TITLE VII RETALIATION

Plaintiff next alleges that ORMC retaliated against him for complaining about discrimination by "subjecting his file to scrutiny in search of a reason to terminate him, and

---

[58]*Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

[59]*Anderson*, 477 U.S. at 248.

[60]*Harney*, 526 F.3d at 1104.

[61]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

ultimately by terminating him for specious and illegitimate reasons."[62]  This claim is subject to

the *McDonnel Douglas* burden shifting analysis described above.[63]

First, Plaintiff must establish a prima facie case of retaliation.  He may do this by showing

"(1) [he] engaged in protected opposition to Title VII discrimination; (2) [he] suffered an adverse

employment action; (3) there is a causal connection between the protected activity and the

adverse employment action."[64]  If Plaintiff does this, Defendant must proffer a "legitimate,

nondiscriminatory reason for [Plaintiff's] termination."[65]  Upon Defendant's satisfactory proffer,

Plaintiff "has the burden of demonstrating that this proffered explanation is a pretext for

retaliation."[66]

Defendant does not dispute that Plaintiff has established a prima facie case of retaliation.

The burden therefore shifts to ORMC to present a legitimate reason for firing Zisumbo.  As

stated above, it has done this by asserting that it terminated Zisumbo for submitting a falsified

document—the St. Mark's letter.  Plaintiff therefore has the burden to show that a reasonable

factfinder could determine that this explanation is pretextual.  For the same reasons stated above

---

[62]Docket No. 13, at 6.

[63]*Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) ("If . . . the plaintiff is unable to directly establish that retaliation played a motivating part in the employment decision at issue, she may rely on the familiar three-part *McDonnel Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.").

[64]*Id.* at 1227.

[65]*Id.* at 1228.

[66]*Id.*

in regards to Plaintiff's discriminatory termination claim, the Court finds that Zisumbo has met this burden.  Accordingly, the Motion will be denied as it relates to this claim.

C.      COVENANT OF GOOD FAITH AND FAIR DEALING

Finally, Plaintiff claims that ORMC breached the duty of good faith and fair dealing by terminating him in violation of ORMC's policies.  Specifically, Zisumbo claims that ORMC's Code of Conduct creates a contract that gives rise to a duty of good faith and fair dealing.

The covenant of good faith and fair dealing "acts merely as a gap filler to deal with circumstances not contemplated at the time of contracting."[67]  "Since good faith is merely a way of effectuating the parties' intent in unforseen circumstances, the implied covenant has nothing to do with the enforcement of terms actually negotiated . . . ."[68]  Instead, "as distinguished from express terms, the covenant 'is based on judicially-recognized duties not found within the four corners of the contract."[69]

Here, Zisumbo seeks to enforce what he asserts to be the express terms of the Code of Conduct.  He points to the Code's prohibition of retribution for reporting possible misconduct and its prohibition of harassment, including "degrading or humiliating jokes, slurs, intimidation, or other harassing conduct."[70]  Zisumbo does not assert that ORMC has violated any duties that are not found within the four corners of the document.  As a result, his claim is actually one for

---

[67]*United States v. Elec. Power Co-op*, 248 F.3d 781, 796 (8th Cir. 2001).

[68]*Id.* (quoting *Cont'l Bank, N.A. v. Everett*, 964 F.2d 701, 705 (7th Cir. 1992)).

[69]*Markham v. Bradley*, 173 P.3d 865, 871 (Utah Ct. App. Nov. 23, 2007).

[70]Docket No. 56, at 2.

breach of contract, a claim that is not in his Amended Complaint and that he cannot introduce in his opposition to ORMC's Motion for Summary Judgment.  Indeed, Plaintiff sought leave to amend his Complaint to add this claim on September 14, 2012, but later withdrew the motion because he believed it would "be most practical to pursue all of his state law claims in state court."[71]

As Plaintiff's claim for breach of the covenant of good faith and fair dealing is properly construed as one for breach of contract, and Plaintiff's Amended Complaint does not state such a claim, the Court will grant the Motion for Summary Judgment as to this claim.

### IV.  CONCLUSION

It is therefore

ORDERED that Defendant's Motion for Summary Judgment (Docket No. 41) is GRANTED IN PART AND DENIED IN PART, according to the terms of this Order.  It is further

ORDERED that the hearing set in this case for March 25, 2013, is STRICKEN.

DATED   March 22, 2013.

BY THE COURT:

_____
TED STEWART
United States District Judge

---

[71]Docket No. 43, at 1.